PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SONYA VALENZUELA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUPER BRIGHT LEDS INC., a Missouri corporation d/b/a SUPERBRIGHTLEDS.COM,<br><br>Defendant. | Case No.  5:23-cv-1148-JAK-SP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**INTRODUCTION**

**Defendant secretly enables and allows a third-party spyware company to wiretap and eavesdrop on the private conversations of everyone who communicates through the chat feature at www.superbrightleds.com (the "Website"). The spyware company then exploits and monetizes that data by sharing it with other third parties, who use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent. As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq*.**

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be at least 6,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $30,000,0000 exclusive of interests and costs.

2. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3. Defendant is subject to jurisdiction under California's "long-arm" personal jurisdiction statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national sales to Californians and that the website operates as a "gateway" for many such sales, such that the website "is the equivalent of a physical store in California." Since this case involves

illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

## PARTIES

4. Plaintiff is a citizen of California who resides in this Judicial District. While physically within California during the class period, Plaintiff visited Defendant's website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

5. Defendant is a Missouri corporation that claims to be "one of the nation's largest leading online retailers of LED lighting and accessories."

6. Defendant owns, operates, and/or controls the above-referenced Website.

## FACTUAL ALLEGATIONS

7. CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6. Compliance with CIPA is easy, and most website operators comply

by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.[1]

8. Unlike most companies, Defendant *ignores* CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to intercept and eavesdrop on all such conversations. Why? Because, as one industry expert notes, "Live chat transcripts are the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions. . . .***When people are chatting, you have direct access to their exact pain points.***" See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited May 16, 2023) (emphasis added).

9. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate expectations of consumers.

10. To enable the wiretapping and eavesdropping, Defendant has allowed a third party named "LiveHelpNow" to covertly embed code into Defendant's chat feature.

11. The secret code is a type of automatic routing software that automatically acquires and transmits user chat communications to LiveHelpNow without any active input from either Defendant's employees, agents, or human representatives or LiveHelpNow's employees, agents, or human representatives. Indeed, whenever a consumer chats via Defendant's Website, the chat is routed through LiveHelpNow's servers so that LiveHelpNow may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access and analysis. LiveHelpNow

---

[1] https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("[C]ompliance [with CIPA] is not difficult. A business must take certain steps, as part of its privacy program, to ensure that ***any time the business is gathering***, either automatically, or ***with a chat feature, personal data of a consumer/website visitor, that it obtains valid consent consistent with the holdings and determinations of the courts interpreting CIPA*** and other applicable Data Privacy laws.") (last visited June 2023) (emphasis added).

acquired website visitors' chat communications by rerouting them to computer servers that it owns, controls, and maintains. Thus, in actuality, chat conversations occur on LiveHelpNow.net and chat messages are routed through that same URL address, which is different than Defendant's Website. The secret code enables and allows LiveHelpNow to secretly intercept in real time, eavesdrop upon, and store transcripts of Defendant's chat communications with unsuspecting website visitors. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

12. For example, as depicted below, when initiating a live chat on the Website, a new window opens up and directs the browser to: https://www.livehelpnow.net/lhn/lc.aspx.



- 5 -
**FIRST AMENDED CLASS ACTION COMPLAINT**

As depicted below, requesting the routing of the message through LiveHelpNow servers is depicted below:



As depicted below, the data payload for the request containing the message transcript is depicted below:



**FIRST AMENDED CLASS ACTION COMPLAINT**

13. One might reasonably wonder why LiveHelpNow would be interested in intercepting and recording the website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. As shown below, it all about money.

14. LiveHelpNow's chat software is "integrated" with Meta, Inc.'s subsidiaries like Facebook and WhatsApp. (Integration allows various software sub-systems to share data to operate as a unified system.) According to Bloomberg.com, this is all part of Meta's secret "***plan to profit from private chats.***" According to a Blog article published on LiveHelpNow's website on February 5, 2018, "LiveHelpNow can now capture your Facebook business page's posts and ***messenger interactions***. All communications will then be nicely grouped into conversations within the LiveHelpNow operator console." https://livehelpnow.net/blog/facebook-integration/ (last visited Dec. 12, 2023) (emphasis added). Thus, LiveHelpNow freely acknowledges that it has the capability of capturing user interactions on a widely used website instant messaging communication application.

15. So how does it work? ***First***, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with LiveHelpNow's software. ***Second***, Meta generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests. ***Third and finally***, after the chat transcripts intercepted by LiveHelpNow are provided to Meta through "integration", Meta brands like Facebook and WhatsApp bombard the unsuspecting website visitors with targeted advertising based upon the user's website visits and interactions.

16. Through the preceding acts, Meta's former subsidiary, Kustomer, Inc., can freely boast that it will "Transform your support center into a profit generator by bulk messaging specific customer segments based on your unique data . . . to reengage dissatisfied customers." *See* https://www.kustomer.com/product/customer-service/ (last downloaded May 16, 2023). Indeed, all of the schemers – Defendant, LiveHelpNow,

and Meta – all profit from secretly exploiting the private chat data through targeted social media advertising because *"Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests."*[2]

17. LiveHelpNow does more than merely provide a storage function for Defendant regarding Website users' chat communications with Defendant. LiveHelpNow uses its record of Website users' interaction with Defendant's chat feature for purposes other than storage including data analytics and marketing/advertising to consumers. In addition, LiveHelpNow has the capability to use its record of Website users' interaction with Defendant's chat feature for purposes other than storage including data analytics and marketing/advertising to consumers. LiveHelpNow's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third party under Section 631(a) as opposed to a party.

18. LiveHelpNow's website markets its services by stating in an article published on September 26, 2014, nearly a full decade ago, "Chat transcripts contain much more than basic contact information. You can now search through past chats using keywords that relate to products, services, issues or any other topic of interest with ease." https://livehelpnow.net/blog/search-every-word-in-chat-history-automate-chat-greetings-add-external-watchers-to-tickets/ (last visited Dec. 12, 2023).

19. The technology to easily search through chat transcripts a decade ago has coincided with the creation and development of an entire software industry specializing

---

[2] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited May 16, 2023).

in customer relationship management ("CRM") for commercial websites and mobile applications.

20. "CRM (customer relationship management) is the combination of practices, strategies and technologies that companies use to manage and analyze customer interactions and data throughout the customer lifecycle. The goal is to improve customer service relationships and assist with customer retention and drive sales growth. Customer relationship management is a process in which a business or other organization administers its interactions with customers, typically using data analysis to study large amounts of information. [¶] CRM systems compile customer data across different channels and points of contact between the customer and the company. These can include the company's website, telephone, *live chat*, direct mail, marketing materials and social networks. CRM systems can also give customer-facing staff detailed data on customers' personal information, purchase history, buying preferences and concerns." https://www.techtarget.com/searchcustomerexperience/definition/CRM-customer-relationship-management (last visited Dec. 12, 2023) (emphasis added).

21. In extolling the benefits of integrating live chat onto one's commercial website, LiveHelpNow has published an article dated December 4, 2023, on its website stating the following: "Moreover, live chat allows you to gather valuable customer insights, such as their pain points and preferences. You can uncover their needs, wants, and expectations by engaging in conversations with customers. This information is invaluable for refining your products or services, tailoring your marketing strategies, and improving overall customer satisfaction. ***Live chat has become a powerful tool for market research and customer relationship management***." https://livehelpnow.net/blog/increase-online-sales/ (last visited Dec. 12, 2023) (emphasis added).

22. On a particular website advertising LiveHelpNow's services, the website's webpage states in relevant part: "LiveHelpNow is easy to ***integrate with CRMs,***

**FIRST AMENDED CLASS ACTION COMPLAINT**

***ChatBots you've already developed***, and marketing platforms." https://apps.miva.com/livehelpnow-chat.html (last visited Dec. 12, 2023) (emphasis added).

23. LiveHelpNow's website states in a webpage under the heading, "Integration with other CRM systems," the following question, "Can I integrate LiveHelpNow account with SalesForce, HubSpot, SugarCRM or other CRM systems?" Such website responds with the following answer: "LiveHelpNow Help Desk Software ***fully integrates with Salesforce, HubSpot and many other partners***." https://help.livehelpnow.net/1/kb/article/2405/livechat-crm-integration (last visited Dec. 12, 2023) (emphasis added). Salesforce is a well-known software company that provides CRM software and applications focused on sales, customer service, marketing automation, e-commerce, analytics, and application development. Similarly, HubSpot and SugarCRM are also software companies that provide CRM software too. Defendant is a legal entity that is distinct from Salesforce, HubSpot, SugarCRM, and the "many other partners" whose CRM software LiveHelpNow software fully integrates with. Thus, LiveHelpNow's website freely acknowledges that it fully integrates with other CRM software of other software providers who are distinct from Defendant. The foregoing shows that LiveHelpNow software has the capability of simultaneously disclosing Plaintiff's communications to entities other than Defendant.

24. LiveHelpNow's website states that its software provides "Sentiment Analysis," which "uses a selection of words and phrases that will add either a positive or negative value on the chat. If we detect any negative words or phrases said by your customer during the chat it will automatically flag it as a potential negative chat. This sentiment will be determined upon the chat ending, in which it will analyze only the customers messages, provided they sent at least 50 characters total for all messages. At this time only English language messages will be analyzed. Our current logic and list of words and phrases cannot be disclosed at this time, however in the future we will allow enterprise level clients to edit the logic themselves by including or excluding custom

words or phrases. ***The final analysis will only be shared with the account admins or any email added within the account settings, the customer will have no knowledge of this analysis***." https://help.livehelpnow.net/1/kb/article/61405/sentiment-analysis (last visited Dec. 12, 2023) (emphasis added). The foregoing evidence confirms that LiveHelpNow does not merely record or store chat transcripts for the website owner or operator's benefit. LiveHelpNow freely advertises its CRM-related services with respect to its ability to analyze consumer chat messages ***without their knowledge***.

25. Within the last year, Plaintiff visited Defendant's Website and conducted a brief conversation through Defendant's chat feature. Plaintiff used a smart phone (a cellular telephone with integrated computers to enable web browsing). As such, Plaintiff's conversations with Defendant were transmitted from "cellular radio telephones" as defined by CIPA.

26. By definition, Defendant's chat communications from its Website are transmitted to website visitors by either cellular telephony or landline telephony. *See* https://www.britannica.com/technology/Internet ("How does the Internet work?") ("*The Internet works through a series of networks that connect devices around the world through telephone lines.*") (last visited May 16, 2023).

27. Defendant did not inform Plaintiff or Class members that Defendant was secretly allowing, aiding, and abetting LiveHelpNow to intercept and eavesdrop on the conversations during transmission, or that LiveHelpNow provided data from such transcripts to Meta through "integration" with Meta software.

28. Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

## CLASS ALLEGATIONS

29. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All persons within the state of California who within the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

30. <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

31. <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

   a. Whether Defendant aided and abetted a third party in eavesdropping on such communications;

   b. Whether Plaintiff and Class members are entitled to statutory penalties; and

   c. Whether Class members are entitled to injunctive relief.

32. <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

33. <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

34. <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is

impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## FIRST CAUSE OF ACTION

## Violations of the California Invasion of Privacy Act

## Cal. Penal Code § 631

35. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

36. "Any person who, by means of any machine, instrument, or contrivance, or in any other manner [i] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [2] who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state, or [3] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)). ***Here, Defendant violates the third prong, as set forth above, by "aiding, abetting, and conspiring" with both LiveHelpNow and Meta/Facebook to wiretap, intercept, eavesdrop upon, learn, share, and monetize the contents of Defendant's chat conversations.***

*37.* Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA § 631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

38. LiveHelpNow's software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

39. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded. Defendant also aided and abetted, agreed with, employed, or conspired with at least one third party to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding the software code for Third Party Software Company's software on Defendant's Website.

40. Defendant knows that LiveHelpNow, through software, captures the electronic communications of visitors to Defendant's Website, and pays Third-Party Software Company to conduct these activities.

41. Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's or LiveHelpNow's actions.

42. Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code § 631(a), entitling Plaintiff and/or Class Members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;
2. An order declaring Defendant's conduct violates CIPA;
3. An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;
4. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
5. Statutory damages pursuant to CIPA;
6. Reasonable attorneys' fees and costs; and

All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  December 18, 2023          PACIFIC TRIAL ATTORNEYS, APC

                                   By: */s/ Scott J. Ferrell*
                                   Scott. J. Ferrell
                                   Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated: December 18, 2023

                                               */s/ Richard H. Hikida*
                                                  Richard H. Hikida